UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KESHAWN FULTON MITCHELL,<br><br>   Plaintiff,<br><br>   v.<br><br>COUNTY OF CONTRA COSTA, et al.,<br><br>   Defendants. | Case No. 21-cv-05014-DMR<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 75 |

Plaintiff Keshawn Fulton Mitchell filed a civil rights action under 42 U.S.C. § 1983 claiming that he suffered constitutional violations by the County of Contra Costa ("Contra Costa") and Deputy Sheriffs Thomas Brook and Kyle Emley in connection with Mitchell's February 2020 arrest. Defendants now move for partial summary judgment. [Docket No. 83.] The court held a hearing on April 13, 2023. For the following reasons, Defendants' motion is granted as to the malicious prosecution and fabrication of evidence claims. The motion for summary judgment on the *Monell* claim is held in abeyance pending resolution of the parties' related discovery dispute.

**I.   BACKGROUND**

   **A.   Factual Background**

   The following facts are undisputed, unless otherwise noted.

   On February 27, 2020, Mitchell called his friend Deandre Jenkins and asked him for a ride from Oakland to his mother's house in Richmond, California. [Docket No. 75-2 (Rodriquez Decl. Mar. 8, 2023) ¶ 3, Ex. B (Mitchell Dep.) 52, 60, 62, 85, 96.] Jenkins picked up Mitchell in a black Audi. [Docket No. 75-5 (Baker Decl. Jan. 5, 2023) ¶ 5, Ex. B at ECF pp. 3-15 (Gant Incident Report, at 5 (describing vehicle)).] There were already two other passengers in the car, DJ and Aaron. Mitchell Dep. 75-76, 96. Mitchell sat in the backseat on the right side. *Id.* at 96. He later learned from police that the car was stolen. *Id.* at 249.

After driving around in Oakland, the four drove to Richmond via interstate 580. Mitchell testified that at some point after they exited the freeway, "the police got behind us." *Id*. at 101-102. Deputy Sheriff Brandon Gant later wrote in an incident report that earlier in his shift, he had received a report of a stolen black Audi Q5. At around 4:30 p.m., while stopped at an intersection in a fully marked patrol car, Gant spotted a black Audi that matched the description of the stolen car and positioned his patrol car behind the Audi. Gant Incident Report 5. After apparently spotting the patrol car, Jenkins drove through a red light and began speeding away. Mitchell Dep. 102, 108. Gant then activated the siren and lights on the patrol car and began pursuing the Audi. Mitchell Dep. 102, 107; Gant Incident Report 5.

Mitchell testified that Jenkins was driving faster than the speed limit and weaving between lanes of traffic and made no attempt to pull over or stop. Mitchell Dep. 103, 107-109. Right after Mitchell told Jenkins to "slow down" the Audi crashed into another vehicle. *Id*. at 109. Mitchell estimates that Jenkins had been driving away from the police for about one minute at the time of the crash. *Id*. at 108. Jenkins kept driving after the collision and finally stopped the car at an underpass. *Id*. at 102, 112-13.

After the Audi came to a stop, Jenkins, Aaron, and DJ got out of the car and started running in the direction the car was facing, *id*. at 115-16, and the officer in the patrol car got out and chased the three on foot. Gant Incident Report 5; Mitchell Dep. 103. Mitchell stayed in the car; he testified that he was nervous, "shaken up," and scared. *Id*. at 118, 120. However, after the officer ran by the car Mitchell got out and ran in the opposite direction. *Id*. at 103, 119-20.

As Mitchell ran out of the underpass, he looked to his right and saw a police car following him through the intersection. *Id*. at 133-34. The car stopped and Mitchell heard an officer yelling, "[s]top bitch," "[y]ou little bitch, get on the ground," "taser," and "freeze." *Id*. at 133, 137. At that point he realized that the officers were chasing him on foot. *Id*. at 137. Mitchell testified that he kept running "at full speed" for another "10 seconds or so" after he heard the officers yelling. *Id*. at 137, 143. When he saw that "they were pretty close," he "gave up" and "kind of sprawled down on the floor." *Id*. at 133, 141-42. The officers were less than eight feet away from him when he got on the ground. *Id*. at 142-43.

According to Mitchell, by the time he got on the ground the officers "were banging [him] up" and he "was getting beat on." *Id*. at 143. Mitchell states that while he was on the ground, he "was struck on the back of [his] head which pushed [his] face into the ground" causing dental injuries, abrasions to his face, and injuries to the back of his head. [Docket No. 77-4 (Mitchell Decl. Mar. 20, 2023) ¶ 3.] After less than a minute the officers handcuffed Mitchell while he was still on the ground. After he was lifted to his feet he spat out what felt like rocks from his mouth and realized his teeth "were chipped into little pieces." Mitchell Dep. 174, 175.

Brook and Emley wrote incident reports in which they wrote that they saw Mitchell running away from the Audi, exited their patrol vehicle, and gave chase. Baker Decl. Ex. B at ECF pp. 16-18 (Brook Incident Report, at 2); ECF pp. 19-23 (Emley Incident Report, at 2-3). Each wrote that they gave Mitchell multiple commands to "stop running" and "get on the ground" but that he did not comply. Brook Incident Report 2; Emley Incident Report 3.

Their written accounts of their physical contact with Mitchell differ from his testimony. Brook wrote that "[t]he foot pursuit lasted approximately 1 min[ute] for a distance of 200 yards and came to an[ ] end when Mitchell attempted to jump over a wrought iron fence, lost his footing, and fell face first onto the sidewalk." Brook Incident Report 2. Brook wrote that he "put [his] knee into Mitchell's back to keep him pinned to the ground and held him at gun point until Deputy Emley arrived" to help handcuff Mitchell. *Id*. According to Brook's report, Mitchell "sustained three broken teeth and a laceration inside his mouth" as a result of "falling face first into the sidewalk." *Id*. at 2-3. Similarly, Emley wrote in his report that "Mitchell ran approximately 200 yards and then attempted to jump over a wrought iron fence" but "lost his footing and fell face first onto the concrete sidewalk." Emley Incident Report 3. Brook then "controlled Mitchell by using his bodyweight to pin him to the ground" and Emley handcuffed him. *Id*.

Mitchell denies that he ever "climbed a fence" or "fell on [his] face." Mitchell Dep. 250; Mitchell Decl. ¶ 4.

Mitchell was arrested and transported to the hospital for medical attention. Mitchell Dep. 175-76, 253; Brook Incident Report 2; Emley Incident Report 2; Gant Incident Report 3. While at the hospital, Emley gave Mitchell a citation and notice to appear for violating California Penal

Code section 148 and the officers then left the hospital. [Docket No. 77-2 (Lagos Decl. Mar. 23, 2023) ¶ 2, Ex. 2 (Brook Dep.) 47-49.] *See also* Emley Incident Report at ECF p. 23 (Notice to Appear). Mitchell was later released from the hospital. *See* Mitchell Dep. 253.

Brook and Emley's incident reports are both date- and time-stamped after 9:30 p.m. on February 27, 2020. Brook Incident Report; Emley Incident Report.

On May 21, 2020, Deputy District Attorney Brian S. Baker filed a misdemeanor complaint against Mitchell charging him with violation of California Penal Code section 148(a)(1) as follows:

> On or about February 27, 2020, in the County of Contra Costa, State of California, the crime of Resist, Obstruct, Delay Of Peace Officer . . . in violation of PC148(a)(1), a Misdemeanor, was committed in that KESHAWN FULTON MITCHELL did willfully and unlawfully resist, delay and obstruct Brandon Gant, Kyle C. Emley and Thomas B. Brook who was then and there a peace officer attempting to and discharging the duty of his/her office and employment.

Baker Decl. ¶ 5, Ex. A (Complaint). Baker states that he made the decision to file the charge against Mitchell based on his review of the incident reports by Gant, Brook, Emley, and a fourth deputy (Brian Fitzgerald); Sonoma Police Department reports regarding the theft of the Audi; a traffic report regarding the crash; and Mitchell's criminal record. Baker Decl. ¶ 5, Ex. B. He states that "[n]o independent investigation" regarding the incident was made by him or anyone else at his office prior to his decision to file the charge. Baker Decl. ¶ 6.

A May 22, 2020 Notice to Appear directed Mitchell to appear on July 15, 2020 under threat of arrest. Lagos Decl. ¶ 9, Ex. 7. Mitchell appeared in court remotely by Zoom for his criminal proceedings. Mitchell Dep. 252-53.[1] He eventually entered into a misdemeanor pre-trial

---

[1] In their motion, Defendants assert that Mitchell "was obligated to appear remotely in state criminal court on the misdemeanor charge for violation of § 148(a)(1)." Mot. 12. Mitchell objects to this statement "on the grounds that Defendants have not cited to any evidence in support of the statement." [Docket No. 77-1.] As an initial matter, Mitchell's submission of an evidentiary objection in a separate filing violates Local Rule 7-3(a), which provides that "[a]ny evidentiary and procedural objections" to a motion "must be contained within the" brief or memorandum in opposition. Moreover, the objection is without merit. When asked if he "appeared in Court" regarding the charge against him, Mitchell testified, "first it was just, like, when the pandemic had kind of started happening . . . [s]o we didn't go in. The lawyer kind of did some over the hone stuff . . . [a]nd I had a Zoom." Mitchell Dep. 252-53. Defendants cited this testimony in the factual background section of their motion. *See* Mot. 3. The objection is denied.

4

diversion order pursuant to which he agreed to pay a fine, perform community service, and "stay out of trouble for six months." Mitchell Dep. 254; Lagos Decl. ¶ 8, Ex. 6. The charges were dismissed at the end of the six-month period. Mitchell Dep. 255; Lagos Decl. ¶ 10, Ex. 8.

### B. Procedural History

Mitchell filed a complaint on June 29, 2021. Defendants subsequently moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss certain claims, which the court granted with leave to amend on February 22, 2022. *Mitchell v. Cnty. of Contra Costa*, No. 21-CV-05014-DMR, 2022 WL 526161, at *7 (N.D. Cal. Feb. 22, 2022). Mitchell filed an amended complaint and Defendants again moved to dismiss certain claims. The court granted the motion in part on April 26, 2022, dismissing Mitchell's municipal liability claims under based on failure-to-train and ratification theories as well as his supervisory liability claim. *Mitchell v. Cnty. of Contra Costa*, No. 21-CV-05014-DMR, 2022 WL 1225015, at *10 (N.D. Cal. Apr. 26, 2022).

Mitchell subsequently moved for leave to amend to file a second amended complaint ("SAC") to add a section 1983 claim for malicious prosecution. The court granted the motion on August 30, 2022 and ordered Mitchell to file his proposed SAC by September 6, 2022. *Mitchell v. Cnty. of Contra Costa*, No. 21-CV-05014-DMR, 2022 WL 3925287, at *5 (N.D. Cal. Aug. 30, 2022). Mitchell timely filed the SAC and Defendants moved to dismiss the malicious prosecution claim. The court denied the motion to dismiss on November 14, 2022 and later denied reconsideration. *Mitchell v. Cnty. of Contra Costa*, No. 21-CV-05014-DMR, 2022 WL 16925964, at *5 (N.D. Cal. Nov. 14, 2022); *Mitchell v. Cnty. of Contra Costa*, No. 21-CV-05014-DMR, 2023 WL 420676, at *1 (N.D. Cal. Jan. 26, 2023).

The remaining claims are: 1) a section 1983 claim for violations of the Fourth Amendment based on excessive force, malicious prosecution, and fabrication of material facts against Brook and Emley and Doe Defendants 1 to 100; and 2) a section 1983 claim against Contra Costa and Doe Defendants 101 to 200 under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), based on policies, customs, or practices. [Docket No. 49 (SAC).]

Defendants now move for summary judgment on the malicious prosecution, fabrication of material facts, and *Monell* claims. They do not move for summary judgment on Mitchell's

5

excessive force claim.

## II.    LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must view the evidence in the light most favorable to the non-moving party. *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248). The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists. *Devereaux*, 263 F.3d at 1076. More than a "scintilla of evidence" must exist to support the non-moving party's claims. *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252). A showing that "there is some 'metaphysical doubt' as to the material facts as issue" will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at 587).

### III. DISCUSSION

#### A. Malicious Prosecution Claim

Mitchell brings a 42 U.S.C. § 1983 claim for malicious prosecution in violation of the Fourth Amendment against Brook and Emley. *See* SAC ¶ 20.

To establish a Section 1983 malicious prosecution claim, Mitchell must prove that Defendants "(1) prosecuted [him] (2) with malice; (3) without probable cause; and (4) with 'the purpose of denying [him] equal protection or another constitutional right.'" *Heard v. Jackson*, No. 21-CV-09472-JSC, 2022 WL 2356821, at *4 (N.D. Cal. June 30, 2022) (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 919 (9th Cir. 2012) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) (to establish a malicious prosecution claim, a plaintiff "must show that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right")). Mitchell must also show that "the criminal prosecution ended without a conviction," *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022), and "demonstrate a Fourth Amendment seizure . . ." *See Yousefian v. City of Glendale*, 779 F.3d 1010, 1015 (9th Cir. 2015) (quotation marks and citations omitted).

Defendants move for summary judgment on the malicious prosecution claim on several grounds. They first argue that there was probable cause for Mitchell's arrest and prosecution for violation of California Penal Code section 148(a)(1).

"'Want of probable cause' is a necessary element" of a malicious prosecution claim. *Bouari v. United States*, No. 21-16762, 2023 WL 1794241, at *1 (9th Cir. Feb. 7, 2023) (citing *Thompson v. Clark*, 142 S. Ct. 1332, 1337-38 (2022)). For purposes of a malicious prosecution claim, whether there was probable cause for the criminal charge is a legal question for the court. *Zoellner v. Losey*, No. 18-CV-04471-JSC, 2022 WL 10128051, at *1 (N.D. Cal. Oct. 17, 2022) (citing *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 868 (1989), *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1155-56 (9th Cir. 2015)). "[I]f there is a dispute concerning the defendant's knowledge of facts on which [the initial prosecution was] based, the [trier of fact] must resolve that threshold question." *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006) (alterations in original) (quoting *Sierra Club Found. v. Graham*, 72 Cal. App. 4th 1135, 1154

1    (1999)). "Once those facts are established, the Court decides whether they constitute probable

2    cause." *Zoellner*, 2022 WL 10128051, at *1 (quotation omitted) (citing *Est. of Tucker ex rel.*

3    *Tucker v. Interscope Recs., Inc.*, 515 F.3d 1019, 1031 (9th Cir. 2008)).

4          Plaintiff conceded at the hearing that he cannot establish a malicious prosecution claim if

5    probable cause supported his arrest and prosecution for violating Section 148.

6          Probable cause "exists when officers have knowledge or reasonably trustworthy

7    information sufficient to lead a person of reasonable caution to believe that an offense has been or

8    is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072

9    (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Alternatively, [the Ninth Circuit]

10   has defined probable cause as follows: when under the totality of circumstances known to the

11   arresting officers, a prudent person would have concluded that there was a fair probability that [the

12   defendant] had committed a crime." *Id.* (quotation marks and citation omitted). While conclusive

13   evidence of guilt is not necessary under this standard to establish probable cause, "[m]ere

14   suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*,

15   738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States,* 361 U.S. 98, 101 (1959)).

16   "Probable cause is lacking if the circumstances relied on are susceptible to a variety of credible

17   interpretations not necessarily compatible with nefarious activities." *Gasho v. United States*, 39

18   F.3d 1420, 1432 (9th Cir. 1994) (citations omitted). "Probable cause must be determined at the

19   time the arrest is made. Facts learned or evidence obtained as a result of a stop or arrest cannot be

20   used to support probable cause unless they were known to the officer at the moment the arrest was

21   made." *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1995), *as amended* (Jan. 17, 1996).

22   "Probable cause is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)

23   (cleaned up).

24         Here, the question of probable cause is whether it was "objectively reasonable" for Brook

25   and Emley to suspect Mitchell had violated California Penal Code section 148(a)(1) when they

26   arrested him and caused him to be prosecuted for that crime. *See Conrad*, 447 F.3d at 768. "The

27   question is not whether [Brook and Emley] thought the facts to constitute probable cause, but

28   whether *the court* thinks they did." *See Tucker*, 515 F.3d at 1031 (emphasis in original).

Section 148(a)(1) provides that a person "who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment" is guilty of a misdemeanor. Cal. Penal Code § 148(a)(1). While section 148(a)(1) is "often referred to as a statute prohibiting 'resisting arrest' . . . the statutory prohibition is much broader than merely resisting arrest." *Hooper v. Cty. of San Diego*, 629 F.3d 1127, 1130 (9th Cir. 2011). The elements of the crime are as follows: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *Yount v. City of Sacramento*, 43 Cal. 4th 885, 894-95 (2008) (citation omitted). "The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence." *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002). "Section 148 is most often applied to the physical acts of a defendant," such as "physical resistance, hiding, or running away from a police officer." *Id*.

In this case, Mitchell disputes the truthfulness of the portions of Brook and Emley's incident reports discussing the cause of the injuries to Mitchell's face. Specifically, he disputes their claims that their pursuit of him on foot ended when he attempted to climb over or jump a fence and fell face first into the sidewalk. *See* Opp'n 2-3; Mitchell Decl. ¶ 4. However, he does not address or dispute the facts within Brook and Emley's knowledge up until the point that the chase ended. Accordingly, the record contains the following undisputed facts relevant to Brook and Emley's knowledge: Gant received an alert of a stolen black Audi Q5 during his shift. After spotting a vehicle matching the description of the stolen Audi, he positioned himself behind the vehicle, which immediately ran a red light and began speeding away. Gant Incident Report 5; Mitchell Dep. 102, 108. At some point, Brook and Emley responded to a request by Gant for assistance, although the record contains limited evidence about the information Gant or any other individual conveyed at that time. Brook wrote in his incident report that "Deputy Emley and I responded to the area . . . to assist Deputy Gant with a vehicle pursuit." Brook Incident Report 2; *see also* Emley Incident Report 2 ("Deputy Brook and I responded to the area.").

1          According to Emley's incident report, as he and Brook "took the westbound El Portal

2  Drive exit from westbound I-80, Deputy Gant advised over the radio three black males

3  'footbailed' from the stolen vehicle. Football is a term which means to exit the vehicle and run to

4  evade capture." *Id*. Emley wrote that while he was still in the patrol car, he could "see the stolen

5  vehicle" and saw an individual, later identified as Mitchell, "running from the stolen vehicle." *Id*.

6  Similarly, Brook wrote that as he and Emley "drove down the I-80 W/B off ramp," he saw

7  Mitchell "running W/B on El Portal Drive away from the disabled suspect vehicle." Brook

8  Incident Report 2. Both officers wrote that they exited the patrol car and "gave chase," attempting

9  to catch Mitchell. *Id*.; Emley Incident Report 2-3.

10         Brook and Emley each wrote that while they were running after Mitchell they told him to

11  stop running multiple times and that he did not comply. Brook Incident Report 2; Emley Incident

12  Report 3. Mitchell disputes the substance of what they yelled but does not dispute that he knew

13  that the officers were chasing him on foot and admits that at least one officer told him to "get on

14  the ground." Mitchell Dep. 133, 137. The parties dispute how long the officers were running after

15  Mitchell and how the chase ultimately came to an end.[2] However, Mitchell testified that he kept

16  "running at full speed" for another "10 seconds or so" after he heard the officers yelling and that

17  he "gave up" when he saw that they were less than eight feet away and "sprawled down" on the

18  ground in surrender. Mitchell Dep. 137, 141-43.

19         Defendants cite numerous cases holding that officers have probable cause to arrest a

20  suspect for violation of Section 148 when the suspect flees from an officer attempting to detain

21  them. Mot. 9. For example, in *People v. Allen*, 109 Cal. App. 3d 981, 983 (1980), an officer

22  spotted a group of individuals standing around the trunk of a vehicle with the lid open. The officer

23  could see a pile of jackets in the trunk area that appeared to be new; one was wrapped in clear

24  plastic. *Id*. After the defendant saw the officer, he slammed the trunk closed "and began to hurry

25  away." *Id*. The officer followed the defendant in his car and the defendant started running. After

---

[2] Brook wrote that "[t]he foot pursuit lasted approximately 1 min[ute] for a distance of 200 yards" before Mitchell fell on the ground and Emley wrote that "Mitchell ran approximately 200 yards" before falling. Brook Incident Report 2; Emley Incident Report 3.

United States District Court
Northern District of California

the officer located the defendant hiding in some bushes he arrested him for receiving stolen property. *Id*. at 984-85. The court held that "on the face of the statute it would appear that the physical activity that appellant engaged in, flight and concealment, which *delayed* the officer's performance of his official duty, violated" Section 148. *Id*. at 985-86 (emphasis in original). The court then discussed the facts of the defendant's apprehension and arrest, including that the defendant "knew full well . . . that the officer's attention was centered on him and that the officer wanted to talk with him," and found "that it was unequivocally clear to [the defendant] that the object of the police's attention was [the defendant] as an individual." *Id*. at 987. Accordingly, since the defendant "knew he was going to be detained, and since the detention would clearly have been lawful, it was the officers' duty to cause the detention to be made," and the defendant's actions of "running and hiding . . . caused a delay in the performance" of the officer's duty. *Id*. The court concluded that the officer had probable cause to arrest the defendant for violating Section 148. *Id*. *See also United States v. St. Clair*, No. 21-50286, 2023 WL 2493737, at *1 (9th Cir. Mar. 14, 2023) (finding that there was probable cause to arrest defendant for violating Section 148 after "he fled from the lawful stop of a vehicle in which he was a passenger"; reasoning that the defendant's "flight from the arresting officer in the parking lot delayed the performance of [the officer's] duties and created probable cause to arrest for violating [section] 148." (alterations in original) (cleaned up)); *In re Andre P.*, 226 Cal. App. 3d 1164, 1169 (1991) (describing incident where defendant ran from officer as soon as he exited his patrol car as a "garden variety section 148 violation").

      Viewing the evidence in the light most favorable to Mitchell and construing all inferences in his favor, there is no dispute that Brook and Emley responded to Gant's request for assistance with a "vehicle pursuit"; at least one of the officers (Emley) heard Gant state over the radio that three individuals had fled from the car; both officers then saw Mitchell run away from the car; and the officers started running after Mitchell. Mitchell admits that he knew the officers were running after him and that he heard them order him to get on the ground but that he kept running at full speed for another ten seconds before giving up. Based on these facts, the court concludes that a reasonable officer with Brook and Emley's knowledge would believe that there was a fair

11

probability that Mitchell violated Section 148(a)(1) by delaying the officers' attempts to detain him in connection with Gant's pursuit of the stolen car.

Mitchell does not argue that Brook and Emley's attempt to detain him was wrongful. Nor does he dispute that he was aware that they were officers engaged in the pursuit of their duties while he was running away from them. Instead, he contends that his "delay in complying with [the officers'] commands to get on the ground was something less than 10 seconds" and argues that slow compliance with a police order does not violate Section 148. Opp'n 3. "It is true that 'it surely cannot be supposed that Penal Code section 148 criminalizes a person's failure to respond with alacrity to police orders.'" *In re Muhammed C.*, 95 Cal. App. 4th at 1330 (quoting *People v. Quiroga*, 16 Cal. App. 4th 961, 966 (1993)). But Mitchell's actions cannot be described as "failure to respond with alacrity" to the officers' orders since he admits that he kept "running at full speed" for "10 seconds or so" after he heard the officers yelling at him and that he stopped running only when they had caught up with him. Moreover, Section 148 contains no temporal or distance requirement; it requires simply that "the defendant willfully resisted, *delayed*, or obstructed" an officer while the officer was engaged in the performance of their duties. The undisputed facts demonstrate that Mitchell willfully delayed the officers' attempt to detain him.

"[W]hen the state of the defendant's factual knowledge is resolved or undisputed, it is the court which decides whether such facts constitute probable cause or not." *Tucker*, 515 F.3d at 1031. Based on the undisputed facts regarding Brook and Emley's knowledge, the court concludes that Mitchell has not satisfied the lack of probable cause element of his malicious prosecution claim. Summary judgment is granted as to the malicious prosecution claim.[3]

## B. Fabrication of Evidence Claim

The SAC alleges a 42 U.S.C. § 1983 claim for fabrication of evidence in violation of the Fourth Amendment against Brook and Emley. *See* SAC ¶ 20. According to Mitchell, Brook and Emley fabricated evidence in the form of false statements in their incident reports stating that their

---

[3] Since the court concludes that Mitchell has not established that he was prosecuted for violation of Section 148 without probable cause, it need not reach Defendants' remaining arguments in support of summary judgment on this claim.

12

pursuit of Mitchell ended when he attempted to climb over or jump a fence and fell face first into the sidewalk. *See* Opp'n 2-3; FAC ¶¶ 12, 20.

Defendants move for summary judgment on this claim on the grounds that Mitchell cannot show that the purported fabricated facts in the incident reports caused a Fourth Amendment seizure since Mitchell was released from police custody at the hospital on the day of the incident and was not "seized" again under the meaning of the Fourth Amendment. Mot. 14. They also argue that Mitchell cannot show that any fabricated facts in the incident reports caused him harm since there was probable cause for his arrest for violation of Section 148. *Id*. at 14-15.

In his opposition, Mitchell cited standards for fabrication of evidence claims brought under the due process clause of the Fourteenth Amendment. *See* Opp'n 7-8. However, the SAC does not allege a Fourteenth Amendment claim; his fabrication of evidence claim arises under the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 364 (2017).

Neither side addressed the elements of a claim for fabrication of evidence under the Fourth Amendment. One court within the Ninth Circuit has held that "an officer's actions based on fabricated evidence violate the Fourth Amendment only if there is no probable cause without the fabrication." *Flores v. City of Bakersfield*, No. 1:17-CV-1393-JLT, 2019 WL 7038385, at *22 (E.D. Cal. Dec. 20, 2019) (citing *Franks v. Delaware*, 438 U.S. 154, 156 (1978) (holding that if a defendant establishes by a preponderance of the evidence that a statement in a warrant affidavit was knowingly and intentionally false or made with reckless disregard for the truth, the warrant must be voided if "the affidavit's remaining content is insufficient to establish probable cause"), *aff'd,* 834 F. App'x 400 (9th Cir. 2021). "Thus, where a plaintiff makes a substantial showing that an officer included fabricated evidence in an affidavit, the court should grant summary judgment for a Fourth Amendment claim if the facts nevertheless state probable cause with the fabrication omitted." *Id*. (citing *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995) (holding that a plaintiff "alleging judicial deception must make a substantial showing of deliberate falsehood or reckless disregard for truth and establish that, but for the dishonesty, the challenged action would not have occurred." (cleaned up)). Mitchell attempts to distinguish *Flores* on its facts but does not dispute

1  its statement of the legal standard applicable to Fourth Amendment fabrication of evidence claims.

2  In this case, Mitchell contends that he has "demonstrated deliberately-false statements";
3  specifically, Brook and Emley's statements in their incident reports that Mitchell did not surrender
4  but instead attempted to climb over or jump a fence and fell face first into the sidewalk. *See*
5  Opp'n 2-4; Mitchell Decl. ¶ 4. As discussed above, the court has already concluded that a
6  reasonable officer with Brook and Emley's knowledge would believe that there was a fair
7  probability that Mitchell violated Section 148(a)(1) by delaying the officers' attempts to detain
8  him. For similar reasons, the court concludes that probable cause existed to arrest and prosecute
9  Mitchell for violating Section 148(a)(1) because his flight delayed the officers' attempts to detain
10 him in connection with Gant's pursuit of the stolen car. In other words, no reasonable jury could
11 conclude that his arrest and prosecution were not supported by probable cause based solely on the
12 undisputed facts set forth in the incident reports; i.e., that the officers ran after Mitchell after he
13 fled the Audi and ordered him at least once to get on the ground but Mitchell kept running at full
14 speed for "10 seconds or so" before being apprehended. Mitchell offers no authority or argument
15 that he can maintain a fabrication of evidence claim under these circumstances, where probable
16 cause for the arrest and prosecution exists even without taking into account the allegedly
17 fabricated evidence about how the chase ended.

18 Additionally, Mitchell's counsel acknowledged at the hearing that Mitchell must
19 demonstrate that he was seized within the meaning of the Fourth Amendment as a result of the
20 fabricated evidence. He conceded that no such seizure occurred here, since he was arrested,
21 transported to the hospital, and released *before* Brook and Emley prepared their incident reports
22 containing the allegedly false statements. Accordingly, summary judgment is granted on the
23 Fourth Amendment fabrication of evidence claim.

24 At the hearing, Mitchell argued for the first time that he wishes to bring a fabrication of
25 evidence claim under the Fourteenth Amendment, not the Fourth Amendment, and requested leave
26 to amend the SAC to state a Fourteenth Amendment claim. Federal Rule of Civil Procedure 15(a)
27 provides generally that leave to amend the pleadings before trial should be given "freely . . . when
28 justice so requires." Fed. R. Civ. P. 15(a)(2). In the absence of an "apparent" reason, such as

14

1   undue delay, bad faith or dilatory motive, prejudice to the opposing party, futility of the
2   amendments, or repeated failure to cure deficiencies in the complaint by prior amendment, it is an
3   abuse of discretion for a district court to refuse to grant leave to amend a complaint. *Foman v.*
4   *Davis*, 371 U.S. 178, 182 (1962). However, these factors do not "merit equal weight," and "it is
5   the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence*
6   *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).
7   Defendants objected to Mitchell amending the complaint to replace his Fourth Amendment
8   fabrication of evidence claim with a Fourteenth Amendment claim, arguing that they would be
9   prejudiced by such an amendment. Specifically, Defendants argue that the proposed amendment
10  would necessitate reopening discovery to obtain testimony from the deputy district attorney that
11  prosecuted Mitchell regarding his decision to charge Mitchell with violating Section 148.
12  Defendants contend that they would also potentially retain an expert to opine on whether a
13  reasonable prosecutor would have charged Mitchell based on the undisputed facts in Brook and
14  Emley's incident reports. Mitchell did not respond to Defendants' assertion of prejudice, arguing
15  only that the evidence used to prove a fabrication of evidence claim under either the Fourth or the
16  Fourteenth Amendment is similar. He also did not explain why he delayed seeking amendment.
17  Fact and expert discovery closed on February 14, 2023 and March 14, 2023, respectively.
18  The parties' pretrial submissions are due in early June 2023 and trial is set to begin on July 10,
19  2023. [*See* Docket No. 31.] Given the late stage of the proceedings, leave to amend to add a
20  deliberate fabrication of evidence claim under the Fourteenth Amendment is denied on the basis of
21  prejudice to Defendants and unexplained delay on Mitchell's part in requesting amendment.
22  Even if the court gave Mitchell leave to add a Fourteenth Amendment claim, summary
23  judgment would be granted on the claim based on the existing record. "[T]here is a clearly
24  established constitutional due process right not to be subject to criminal charges on the basis of
25  false evidence that was deliberately fabricated by the government." *Caldwell v. City & Cty. of San*
26  *Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018) (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1074-
27  75 (9th Cir. 2001)). To establish a Fourteenth Amendment claim for fabrication of evidence, "a
28  plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the

15

deliberate fabrication caused the plaintiff's deprivation of liberty." *Caldwell*, 889 F.3d at 1115 (citation omitted). "[A] § 1983 plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough." *Id*. (citation omitted). Here, Mitchell presents no evidence that he was charged with violating Section 148 "on the basis of" the allegedly false statements in the incident reports. While Mitchell "need not prove a lack of probable cause" for his prosecution to establish a deliberate fabrication claim, *Spencer v. Peters*, 857 F.3d 789, 801-02 (9th Cir. 2017), he must "demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." *Id*. at 800 (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008)). Mitchell does not present any evidence sufficient to create a triable issue of fact as to causation for purposes of a Fourteenth Amendment deliberate fabrication claim.

### C. *Monell* Claim

Finally, Defendants move for summary judgment on Mitchell's *Monell* claim based on policies, customs, or practices. Mitchell asks the court to defer consideration of the motion pursuant to Rule 56(d)(1) until he can take a Rule 30(b)(6) deposition of Contra Costa. Opp'n 9. That deposition is the subject of a pending discovery motion. [*See* Docket No. 67.] The court finds it appropriate to defer consideration of Defendants' motion until after the discovery dispute is resolved and holds that portion of the motion in abeyance.

//
//
//
//
//
//
//
//

IV. **CONCLUSION**

For the foregoing reasons, Defendants' motion for partial summary judgment is granted in part. Summary judgment is granted on Mitchell's malicious prosecution and fabrication of evidence claims. Defendants' motion for summary judgment on the *Monell* claim is held in abeyance pending resolution of the parties' related discovery dispute.

**IT IS SO ORDERED.**

Dated: April 17, 2023



Donna M. Ryu
Chief Magistrate Judge